# AMERICAN ARBITRATION ASSOCIATION
## Employment Arbitration Tribunal

In the Matter of the Arbitration between

Re: 70 160 00113 10
Joshua Jumbo
and
Valero Retail Holdings, Inc.

## AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the personnel manual or employment agreement entered into by the above-named Parties and having been duly sworn and having duly heard the proofs and allegations of the Parties, AWARD as follows:

The claims of Joshua Jumbo are denied.

## REASONS FOR AWARD
### Background

1.  The Claimant brings this arbitration[1] alleging that his former employer, Respondent Valero Retail Holdings, Inc.[2] retaliated against and terminated him on August 25, 2008 on the basis of his race (Black) and national origin (Nigerian). The Claimant seeks reinstatement, compensatory and non-economic damages[3] for his alleged physical and emotional distress, as well as an award of attorney's fees. The Respondent denies all of the Claimant's allegations, contending that the Claimant was terminated for a legitimate, non-discriminatory reason -- poor work performance. This matter was heard over two (2) days, during which five (5) witnesses and multiple exhibits were presented. The Parties submitted post-Hearing briefs in support of their positions. Having carefully considered the

---

[1] The Claimant initiated a lawsuit in the U.S. District Court for the Southern District of Texas, but it was ordered to arbitration.
[2] The Claimant's Amended Demand for Arbitration refers to the Respondent's holding company, Valero Energy Corporation, although the Claimant's employer was Valero Retail Holdings, Inc. His employer, Valero Retail Holdings, Inc., is the proper Respondent herein. Moreover, no evidence was presented during the Hearing concerning any claims against Valero Energy Corporation so the Claimant's claim(s), if any, against that entity have been abandoned.
[3] The Claimant's Demand for Arbitration sought $500,000.00 in damages; at the Hearing, he raised that amount to $1,000,000.00.

Exhibit 1

evidence and the Parties' arguments, the undersigned concludes that the Claimant has failed to establish that the Respondent retaliated or discriminated against him.

## The Facts

2. The Claimant applied for a job with the Respondent in mid-2007. He had good references as well as an excellent resume -- a college degree; thirty (30) years of experience working in convenience stores, including management positions for other companies; and he had owned a convenience store for several years. Maria Martin, an Area Manager for the Company, invited the Claimant to interview although there was not a position immediately available. The Claimant was first interviewed by Area Manager ("AM") Martin, who suggested to Area Manager ("AM") Doug Fitzpatrick that he, too, talk to the Claimant. Based on their positive comments about the Claimant, Zone Manager Todd Gray interviewed the Claimant and he, too, was impressed. The Claimant was hired effective July 13, 2007. His initial position was a "SMIT" -- Store Manager in Training -- at an annual salary of $30,000.00.

3. The SMIT process generally lasts thirty (30) to ninety (90) days, and includes classroom, computer and on-the-job training. It is designed to familiarize prospective Store Managers with store operations and Company policies. The Claimant successfully completed the SMIT training and received a Certificate dated October 22, 2007, noting that he had done so. The Claimant's initial assignment was to Store 2385, where Brenda Allen was the Store Manager ("SM") and which was supervised by AM Martin. The Claimant testified that Zone Manager Gray had told him that he was to be Store 2385's "Co-Manager" with SM Allen, and that he was being placed there to assist SM Allen in controlling losses. Zone Manager Gray denied making such a statement, and the evidence indicated that there are no "co-Managers" within the Company. The evidence also failed to show that Store 2385 was being impacted by losses. However, SM Allen indicated to AM Martin that the Claimant was not receptive to her on-the-job training, and seemed to believe he did not need it.

4. While working at Store 2385, the Claimant alleges that he was harassed by a Customer Service Representative ("CSR") named Crystal Lewis. According to the Claimant, CSR Lewis rubbed his head with her hands and then told him she had not washed her hands after using the bathroom; and sent him a non-work related text message stating, "Not Here." The Claimant also contends that she called him a "black motherfucker." The Claimant alleges that he complained to AM Martin about CSR Lewis's actions. AM

2

Martin acknowledged that the Claimant told her about the text message and head rubbing incident, but denied that the Claimant had ever stated that any racial remarks had been made. Human Resources Advisor Niger Pratt, who met several times with the Claimant after he initiated a Dialogue complaint in July of 2008, also denied that the Claimant ever brought up any race-based comments[4]. This Arbitrator notes that the alleged racial comment, which occurred sometime in the latter part of 2007, was not mentioned in the Claimant's written response to AM Martin's December 6, 2007 Interoffice Memorandum, or in his written response to AM Fitzpatrick's July 27, 2008 memorandum, although his latter response specifically referred to the CSR Lewis head rubbing incident. The Claimant contends that AM Martin ignored his complaint about CSR Lewis, but AM Martin testified that she spoke with CSR Lewis and learned that the text message[5] was sent to the Claimant in error, which is what CSR Lewis had told the Claimant. CSR also told AM Martin that she had been "joking" when she rubbed the Claimant's head. AM Martin testified that she advised CSR Lewis that her actions were inappropriate and that the Claimant had not appreciated them. AM Martin also testified that she considered CSR Lewis' actions akin to horseplay, and that she did not believe they warranted a disciplinary write-up. However, AM Martin decided to put CSR Lewis' training as an Assistant Manager on hold because of her immaturity and lack of judgment. Thus, the evidence indicated that AM Martin did not ignore the Claimant's complaint about CSR Lewis, and that she took reasonable and appropriate action in response to the complaint. The Claimant had no further interaction with Ms. Lewis as of mid-November, 2007.

    5.    The Claimant was assigned to Store 2641 as a Relief Manager for approximately four (4) weeks in November and December, 2007, while that store's SM, Patrick Ogude,[6] was on vacation. This assignment was the first time the Claimant was operating a Company store on his own. AM Martin testified that she monitored the Claimant's performance, and spoke with him several times concerning deficiencies related to paperwork issues, requesting beer and cigarette roll-ups, and Tuesday promotions. The Claimant told AM Martin he could not accomplish everything because there were not enough employees and he was "tied to the register." Because her verbal counseling of the Claimant had not had the intended effect, AM Martin prepared an Interoffice Memorandum

---

[4] She testified that she certainly would have remembered a racial comment, had the Claimant brought it up, because she also is Black.

[5] A single unsolicited text message – particularly one with an innocuous message of "not here" – falls far short of constituting harassing or discriminatory conduct. The Claimant did not explain why he allegedly considered this message offensive.

[6] SM Ogude also is a native of Nigeria, and also is Black.

3

on December 6, 2007 entitled "Job Performance and Expectations" to assist the Claimant in performing his job duties. The Interoffice Memorandum advised the Claimant that AM Martin was concerned that the Claimant had not been completing daily and weekly paperwork in a timely manner, that an audit had been $2,200.00 short, that required signage was not in place, that certain products had been over-ordered, and that out-of-date milk was on the shelf. AM Martin told the Claimant that she did not believe he was ready to run a store and that she believed he needed additional training. She also prepared a detailed checklist of SM job duties and expectations, and told the Claimant if he could not master them he could be demoted or terminated from employment. The Claimant wrote his response on the bottom of the checklist,:

> This is a pretext for retaliation consistent with your pattern of behavior toward me. I do not appreciate your assault on my integrity, reputation and character.

6. At about the same time, a review of the Store's digital video recording ("DVR") system[7] indicated that the Claimant had stayed after hours in a backroom, resting in a chair with his feet up, for significant periods of time. During a meeting held on December 7, 2007, the Claimant was advised by HR personnel (Kathie Jones) and AM Martin that remaining in the store overnight or sleeping in the store was not appropriate or acceptable. The Claimant was advised that he was not allowed to stay in the store after hours, in part due to safety concerns. This meeting apparently did not have the intended effect and, in early January of 2008, AM Martin again counseled the Claimant about staying in the store after authorized hours. He did not deny such conduct, and told AM Martin that he needed to stay at the store to ensure proper operation. By memorandum dated January 4, 2008, Zone Manager Gray advised the Claimant as follows:

> Be advised that you are being placed on final notice for failure to follow the directives that have been communicated to you relative to being in the store overnight – during unauthorized hours and (what appears) sleeping in the store. If in the future it is determined that you have committed the same offense, you will leave me no option but to terminate your employment. Again, the issue is of your personal safety.

7. In a separate memorandum dated January 4, 2008, Zone Manager Gray noted that he had been communicating with Human Resources ("HR") personnel and AM Martin, who had expressed several apparent obstacles to the Claimant's success as a SM. These included the Claimant's failure to have reports and paperwork completed in a timely

---

[7] All of the Company Stores are monitored by DVR for security reasons.

manner; inefficient use of time; failure to communicate effectively with Management; a tendency to be non-receptive to instructions; and hesitancy to ask for additional help when needed. Therefore, Zone Manager Gray stated, he determined that the Claimant should work for several weeks, effective January 17, 2008, as a "Manager in Training" with Flagship Manager Javier Guillen -- who was described as one of the Company's best SMs -- at Store 2648. Zone Manager Gray advised the Claimant that he expected him to have all the skills and abilities to assume a store assignment after completing his training with SM Guillen, and noted that he had full confidence in the Claimant's ability to do so. The Claimant successfully completed his retraining with SM Guillen on February 2, 2008. The Claimant was invited to participate in his performance review on February 4, 2008, at which all participants seemed to believe that the Claimant was doing well.

8. After retraining with SM Guillen, the Claimant was assigned to manage Store 2517. On February 5, 2008, AM Doug Fitzpatrick, who had become the Claimant's supervisor by that time, provided the Claimant with a detailed list of nineteen (19) areas in which the Claimant previously seemed to have had difficulties. These included but were not limited to Plan O Gram, E-Planner, Merchandising, Paperwork, Delegation and Availability issues. AM Fitzpatrick asked the Claimant to review the duties and initial those he was confident he could perform, and the Claimant initialed all of the listed items. AM Fitzpatrick visited Store 2517 weekly, and noticed improper stocking of shelves and misplaced price tags. Moreover, Store 2517 was not audit ready, had recurring cash losses and merchandise was not being ordered appropriately. AM Fitzpatrick testified he had numerous discussions with the Claimant about these problems When the verbal counseling did not result in the desired improvements, AM Fitzpatrick prepared a review of Store 2517's audits, dated May 9, 2008, notifying the Claimant that it was designed "to help us go forward with good audits." Store 2517's audits had been satisfactory in February and March, 2008, when the Claimant first became its SM. As a result, no audit was performed in April. However the audit performed on May 2, 2008 showed a loss in excess of $3,000.00, which was unacceptable. AM Fitzpatrick's audit review listed ten (10) items that "needed to happen" for good audits, including but not limited to timely completion of paperwork, proper tagging and signage, efficient use of time and teamwork. Nevertheless, Store 2517's June and July audits were deficient. The Store's July audit was almost $4,000.00 short.

9. On July 11, 2008, the Claimant initiated a Dialogue complaint with the Company, complaining of CSR Lewis' actions the preceding year and HR's allegedly

5

inadequate investigation; his belief that AMs Martin and Fitzpatrick created an atmosphere that prevented the Claimant from controlling his employees; and allegations that Store 2517's May and June audits were "bogus" and that their unacceptable results had been pre-determined. After the Claimant made his Dialogue complaint, HR personnel met with him several times. AM Fitzpatrick also met with the Claimant and HR to discuss the audit issues. According to the Employee Complaint Response Form relating to the Claimant's Dialogue complaint, the Claimant agreed that his concerns had been addressed effectively. The Employee Complaint Response Form reflects August 15, 2008 as its date of resolution.

10. On July 18, 2008, AM Fitzpatrick prepared a Memorandum to the Claimant entitled, "Unsatisfactory Inventory Losses." AM Fitzpatrick noted that the Claimant had done little to improve his performance despite prior verbal notifications and that, "You must take this responsibility serious and get it done." He then listed six (6) requirements, with detailed instructions, for the Claimant, which he instructed the Claimant to follow "until further notice":

- Weekly Roll Ups
- Video Reviews
- Store Visits
- Required Hours
- Vendor Check-in
- Monitor and Train Your Staff

AM Fitzpatrick also stated,

> I sincerely hope that you will embrace this opportunity to improve your performance to a level that meets company expectations. Failure to do so will result in further disciplinary action up to and including demotion or termination of employment.

The Claimant did not initial the six (6) directives to indicate he understood them. Rather, he acknowledged the Memorandum on July 27, 2008 and returned it to AM Fitzpatrick with a six (6) page letter citing his long experience in the convenience store industry and essentially blaming his employees and "bogus" audit counts for Store 2517's poor audits. He also claimed that, about a year previously, Crystal Lewis (a white female), had rubbed her unwashed hands on his head, used profanity toward him and sent him a non-job related text message. According to the Claimant,

> There was no action taken by (the Company). I have perceived a conspiracy for retaliation against me. On July 11, 2008, I filed a complaint

6

of non-support with Dialogue. On July 18, 2008, you handed me a letter threatening to terminate my employment without cause.

11. On August 1, 2008, the Claimant was given a Memorandum directing that Store 2517 have full shelves by August 4, 2008; that it be prepared for a 3fc[8] inspection by August 12, 2008; and that the store must achieve an inspection score of 85 to 90. The Memorandum also advised that Store 2517's cash had to be controlled, as it was averaging $100 per week in unexplained cash losses. Zone Manager Gray was not able to perform the inspection on August 12th, but he did perform it on August 21, 2008. The inspection score was 64, well below an acceptable level. At this point, Zone Manager Gray determined that the Claimant had failed to improve, and showed no intent to improve, his performance despite repeated counseling, retraining and other efforts to conform the Claimant's job performance to the Company's expectations. Moreover, Zone Manager Gray noted that the Claimant seemed unwilling to accept any responsibility for his performance deficiencies, choosing instead to blame his employees and managers. Additionally, Zone Manager Gray learned that the Claimant once again was staying in the store after hours[9], contrary to the Company's previous warnings that doing so was prohibited and despite Zone Manager Gray's final warning dated January 4, 2008. The Claimant's repeated disregard of instructions -- which Zone Manager Gray considered to be insubordination -- indicated to Zone Manager Gray that the Claimant was not amenable to corrective action and that there were no other options but to fire the Claimant. Effective August 25, 2008, the Claimant was terminated for "poor work performance." He thereafter initiated legal action against the Respondent.

### The Claimant's Discrimination Claim

12. The Claimant asserts that the Respondent discriminated against him with regard to his salary, his bonus and his termination. However, the Claimant's complaints about his salary and bonus are factually inaccurate. As to the Claimant's salary, the evidence demonstrated that the Claimant's initial rate of pay was $30,000.00 per year which, according to AM Martin, was mid-range compensation for a SMIT. AM Martin testified that most SMITS are hired at a lower salary, but that the Claimant was paid more due to his background and experience. The evidence also demonstrated that the Claimant

---

[8] The 3fc Standards Evaluation is a comprehensive inspection of a Store's facilities, equipment, merchandise and personnel.
[9] The Claimant had been seeing reentering the store when it was closed, and the DVR confirmed that he was in the store in a semi-dressed state.

7

received a $3,000.00 annual pay increase effective April 10, 2008 and another $990.00 annual adjustment effective July 1, 2008. The Claimant alleges that he was paid less than non-Black, non-Nigerian Store Managers, and points to two (2) other SMs of Store 2517, Barbara Dixon and Cecilia Johnson, for comparison. However, the evidence failed to support the Claimant's contentions regarding salary disparity. The evidence established that he and SM Barbara Dixon were paid the same amount ($33,000.00 per year) when they completed their SMIT training, and that his salary surpassed hers as of July 1, 2008. Moreover, SM Cecilia Johnson was paid less than the Claimant and SM Dixon and, thus, cannot be used as a comparator to support the Claimant's case. Although SM Dixon's salary was $2,000.00 higher than the Claimant's at they time they became SMITs, the evidence demonstrated that SM Dixon already had worked for the Company for almost fourteen (14) years when she became a SMIT, unlike the Claimant, who was a new hire. The Claimant failed to demonstrate that he was treated less favorably than similarly situated managers. He also did not prove other facts indicating that his race or national origin played any role in the Respondent's determination of his salary. Accordingly, the Claimant's salary discrimination claim fails.

13. As to the Claimant's bonus, the evidence demonstrated that he received a bonus of $1,600.00 for the first trimester of 2008 (January through April) although he claims that he was entitled to and should have been paid $1,937.50. However, the Claimant fails to take into account that his bonus was prorated due to the fact that he was not Store 2517's SM in January of 2008. Thus, the Claimant's $1,600.00 bonus amounted to ¾ of the bonus he otherwise might[10] have received. Furthermore, the evidence failed to show that AM Fitzpatrick deliberately reduced the Claimant's bonus. Indeed, AM Fitzpatrick's own bonus is based on those of his SMs. Thus, AM Fitzpatrick would have no incentive to reduce the Claimant's bonus because, by doing so, he would reduce his own compensation. Accordingly, the Claimant's claim concerning his bonus payment fails.

14. To prevail on his claim regarding his termination, the Claimant must first establish a *prima facie* of discrimination by showing that:

(1) he is a member of a protected class,

(2) he was qualified for the position at issue,

(3) he was the subject of an adverse employment action, and

---

[10] The Store Manager/Assistant Manager Bonus Program provides that the Respondent reserves the right to amend or terminate the bonus compensation program, and that "No one has a vested interest in any awards prior to the time they are approved by the Vice President of Retail Operations."

>   (4)  he was treated less favorably because of his membership in the protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances.

See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817 (1973). If the Claimant establishes a *prima facie* case of discrimination, the burden then shifts to the Respondent to articulate a legitimate, nondiscriminatory reason for the allegedly discriminatory conduct. If the Respondent satisfies this burden, the Claimant then must show that the Respondent's proffered reason was merely a pretext for discrimination.

15. The undersigned concludes that the Claimant failed to prove a *prima facie* case of discrimination with regard to his termination. Although the Claimant is a member of a protected class, was the subject of an adverse employment action, and arguably was qualified for the position at issue, the evidence failed to show that he was treated less favorably than other non-Black, non-Nigerian employees under similar circumstances. The evidence showed no other SM who had as many recurring performance-related issues as the Claimant and had not been terminated. Moreover, the employee to whom the Claimant sought to compare himself (Candylou Salerious) also was terminated after receiving several warnings. The Claimant suggests that he, too, should have received progressive discipline, as SM Salerious allegedly received prior to being terminated. Yet the Employee Handbook's Employee Conduct & Performance section states, in relevant part, as follows:

>   The Company reserves the right to implement discipline at the most appropriate step that meets the Company's business needs.

Thus, the Respondent was not obliged to apply progressive discipline. Moreover, the testimony of AM Martin, AM Fitzpatrick and Zone Manager Gray about the Claimant's recurring disregard of instructions and failure to accept responsibility for performance deficiencies indicates that, had progressive discipline been applied, it would have been futile.[11]

16. Assuming, however, that the Claimant had established a *prima facie* case of discrimination, the Respondent stated a legitimate, non-discriminatory reason for the Claimant's termination -- poor work performance – which was supported by the evidence. The Claimant attempted to rebut this reason by alleging it was mere pretext for discrimination. In this regard, the Claimant asserts that the unfavorable audits of Store 2517 and the unsatisfactory inspection on August 21, 2008 were bogus. He claims that the

---

[11] The Claimant apparently received progressive discipline – a final warning – about staying in the store after hours, yet he nevertheless continued to engage in the same misconduct.

results were manipulated by AM Fitzpatrick and Zone Manager Gray, respectively, in order to discriminate and retaliate against the Claimant. However, the evidence fails to support the Claimant's allegations of pretext.

17. As to the audits of Store 2517, the evidence wholly failed to indicate that AM Fitzpatrick[12] or anyone else manipulated the numbers to the Claimant's disadvantage. The evidence also failed to demonstrate that the auditors[13] – who were not even employees of the Respondent – falsified the audit results or, for that matter, that they would have any incentive to do so. The Claimant also contends that the loss reflected on the May audit was an error, and points out that the following month's audit showed an overage of more than $3,000.00, thus suggesting that there had been no actual loss the prior month. Yet the July 15, 2008 audit showed a loss of nearly $4,000.00, which was a deviation in excess of five percent (5%) when the goal for audit deviations is no more than one percent (1%). The evidence indicated that audit fluctuations and large deviations such as those reported for Store 2517 result from deficient management. Good audits result when a store is kept in "audit ready" condition, which entails keeping paperwork current, entering invoices timely, updating price tags and properly ordering/stocking merchandise to be counted by the auditor. These are the same types of deficiencies that had been noted with the Claimant's performance as early as December of 2007, and which did not improve over time despite repeated counseling and retraining efforts. The fact that the audits reflected the same problems that had been ongoing over several months indicates that the unsatisfactory audits are attributable to the Claimant's performance deficiencies, and not to errors in or manipulation of the audits.

18. Likewise, the evidence failed to demonstrate that Zone Manager Gray's August 21, 2008 inspection was discriminatory. According to the Claimant, Store 2517 was ready for inspection on August 12th, when Zone Manager Gray had advised he would conduct it. However, the inspection did not occur until August 21, 2008, and the Claimant argues that, had the inspection occurred on August 12th the resulting score would have been higher. This argument is not persuasive. Company Stores are to be ready for inspection at all times. The Claimant even received advance notice of the inspection, and that should have ensured that Store 2517 would be audit-ready not only on August 12th but

---

[12] Inasmuch as AM Fitzpatrick's compensation was impacted by Store 2517's profitability, it is extremely unlikely he would take any action that would negatively affect the store's performance.
[13] The evidence suggested that one of the outside auditors made an inappropriate comment about "someone's job being on the line", according to the Claimant. After the Claimant reported this to AM Fitzpatrick, the latter spoke to the auditor's employer and that auditor did not return to perform audits for other Company stores.

also nine (9) days later, when the inspection was performed by Zone Manager Gray[14]. The Claimant had advance notice, more than sufficient time, advice and multiple instructions that should have resulted in a satisfactory inspection score. Nevertheless, he failed to achieve that result.

19. The Claimant's allegations of discrimination are further diluted by the fact that the Managers whom he claims discriminated against him – AM Martin, AM Fitzpatrick and Zone Manager Gray – all interviewed the Claimant and participated in the decision to hire him. Therefore, all of them were aware of the Claimant's race and national origin before he was offered employment. Under the "same actor inference", there is a presumption that discriminatory animus does not exist when the persons who participated in the adverse action decision also participated in the hiring decision. *See, Brooks v. Lubbock County Hosp. Dist.*, 373 Fed. Appx. 434, 438 n. 14 (5th Cir. 2010) (*citing Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 [5th Cir.1996]). Although such a presumption is rebuttable, the Claimant offered no evidence to rebut it.

20. The evidence reflected that the Respondent had made a significant investment in the Claimant and wanted him to become a successful store manager. Indeed, those whom the Claimant accuses of discrimination gave him numerous opportunities to improve his performance, and even allowed him to retrain with one of the Company's best SMs following his unsatisfactory performance as a Relief Manager. Had the Respondent simply been intent on terminating the Claimant, it could have done so earlier than August of 2008. The Claimant also could have been terminated for ignoring Zone Manager Gray's final warning to stay out of the store after hours, which Zone Manager Gray considered insubordination on the Claimant's part.

21. The Claimant also complains that he was to have been hired as a "Manager" rather than a "Manager in Training" due to his education and extensive prior experience working in convenience stores. However, the Claimant was not familiar with the Company's policies and job requirements, and had no experience working in or running one of its stores. The Claimant was required, just as any other person hired as a prospective Store Manager would be, to complete the Company's thirty (30) to ninety (90) day training.

---

[14] The Claimant also contends that Company policy allows only one (1) inspection per year and that, since Store 2517 had been inspected several months earlier, Zone Manager Gray lacked authority to conduct the inspection. However, there is no policy limiting Zone Managers from inspecting stores as deemed necessary, nor would it make economic sense for any business to adopt such a policy. Indeed, the language relied on by the Claimant to make this argument refers to the "inspection segment" used for computing bonuses.

Moreover, Zone Manager Gray testified that he "absolutely" told the Claimant he was being hired as a Manager in Training, and not as a Manager.

### The Claimant's Allegations About CSR Crystal Lewis

22. The Claimant contends that the Respondent ignored his complaint about CSR Crystal Lewis' conduct[15], which he identified as sending him a non-work related text message; rubbing his head with allegedly dirty hands; and calling him a black motherfucker. The evidence indicated that CSR Lewis told both the Claimant and AM Martin that the "not here" message was sent to the Claimant in error, as it was intended for someone else named "Josh." As to the head rubbing incident, the evidence indicated that AM Martin counseled CSR Lewis about her inappropriate action and put her training for an Assistant Manager position on hold. The undersigned concludes that AM Martin dealt with the Claimant's complaint adequately. The fact that the Claimant contends he did not know whether, or how, AM Martin dealt with his complaint does not support his claims.

23. While the Claimant contends that he complained to AM Martin and, later, HR Advisor Pratt, about CSR Lewis' alleged racial comment, the evidence fails to establish that actually occurred. Both AM Martin and HR Advisor Pratt deny that the Claimant mentioned the alleged racial character of CSR Lewis' comment, and the Claimant's written comments to his Managers or in his Dialogue complaint fail to mention race or the specific term allegedly used. Accordingly, the undersigned concludes that, contrary to the Claimant's contention, he did not advise the Respondent of race-based comment(s),[16] if any. Had he done so, the evidence indicated that the situation would have been promptly investigated and dealt with commensurate with the serious nature of such misconduct.

### The Claimant's Retaliation Claim

24. The Claimant contends that he was subjected to retaliation due to (1) his complaint about Crystal Lewis, (2) his request for a pay increase and (3) his Dialogue complaint about AM Fitzpatrick. To prevail on his retaliation claim, the Claimant would have to establish that: he engaged in protected activity; an adverse employment action occurred;

---

[15] Even if CSR Lewis engaged in all of the conduct alleged by the Claimant, it was not sufficiently severe or pervasive to alter the conditions of the Claimant's employment or to create an abusive and hostile working environment. Accordingly, such comments in and of themselves do not give rise to an actionable claim of discrimination or harassment.

[16] The Claimant testified that AM Fitzpatrick asked him during an interview what he would do about an "irate white customer." AM Fitzpatrick credibly denied asking such a question, and the Claimant did not include any such allegation in any of his written complaints to his Managers or in his Dialogue submission which specifically complained about AM Fitzpatrick.

and a causal link existed between the protected activity and the adverse employment action. The evidence, however, failed to demonstrate an actionable retaliation claim. The Claimant's complaints about CSR Lewis, his pay level, and his Dialogue submission do not constitute protected activity as none were linked to the Claimant's race, his national origin or any other protected characteristic. Accordingly, his allegations concerning retaliation do not rise to an actionable level.

25.     Additionally, the evidence indicated that the Claimant's version of events surrounding the bases for his retaliation claim was inaccurate. As previously discussed, the credible evidence failed to establish that the Claimant ever raised any race-related comments allegedly made by CSR Lewis or AM Fitzpatrick. As to the Claimant's salary, Zone Manager Gray testified he did not recall the Claimant's alleged oral request for an increase in October, 2007, and the documentary evidence[17] fails to reflect that such a request was made. Moreover, an Employee Status Revision form reflects that Zone Manager Gray had initiated a $3,000.00 raise for the Claimant on February 21, 2008, in connection with his promotion to Store Manager, more than a month before the Claimant's alleged second request on April 1, 2008. Although the Claimant's salary increase did not become effective until April 10, 2008, the evidence showed this was because the Company had not received the results of the Claimant's drug and background checks -- which were required in connection with his promotion and resulting salary increase -- until April 3, 2008. Finally, the Claimant had already received significant verbal and written coaching relating to his failure to satisfy the requirements of his position, as well as a final warning about remaining in stores after hours, by the time he initiated his Dialogue complaint. The evidence failed to suggest any causal link between the Claimant's ultimate termination and his complaints. Rather, the evidence demonstrated that the Claimant was terminated due to his continuing inability or unwillingness to perform his job duties in a satisfactory manner.

## Conclusion

26.     The evidence failed to support the Claimant's allegations of race and national origin discrimination. The Claimant failed to state a *prima facie* case of discrimination. Had he done so, however, the evidence demonstrated that the Respondent had a legitimate nondiscriminatory reason for its actions, and there was no showing of

---

[17] If the Claimant felt he was being retaliated against due to this request, it is reasonable to expect that he would have included his concerns in one of his lengthy written submissions to his Managers or to the HR department. He did not do so.

pretext. The Claimant was given multiple opportunities to improve his job performance, but failed to do so. Therefore, the Claimant's claims must be denied in their entirety.

27.   The administrative fees and expenses of the American Arbitration Association ("the Association") and the compensation and expenses of the Arbitrator shall be borne in accordance with the provisions of the personnel manual or employment agreement.

28.   This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

Signed: _____          Dated: January 5, 2011
        Lynne M. Gomez

American Arbitration Association
*Dispute Resolution Services Worldwide*

*Central Case Management Center*

May 5, 2010

13455 Noel Road - Suite 1750, Dallas, TX 75240
telephone: 972-702-8222 facsimile: 972-490-9008
internet: http://www.adr.org/

**VIA E-MAIL ONLY**

Angela L. Harrington, Esq.
Law Office of Angela L. Harrington
1000 The Houston Building
2323 Caroline Street
Houston, TX 77004

Virginia Honeyman
One Valero Way
San Antonio, TX 78249

Re: 70 160 00113 10
    Joshua Jumbo
    and
    Valero Retail Holdings Inc.
    - Houston, Texas

Ladies:

This will confirm a management conference in the above matter was held on May 3, 2010. Enclosed please find the scheduling order established during the management conference.

Claimant and Respondent shall file their initial disclosures on or before May 28, 2010.

Discovery will be completed on or before September 10, 2010.

All dispositive motion(s) shall be filed on or before October 1, 2010. Any response to dispositive motion(s) shall be due on or before October 15, 2010.

Claimant and Respondent shall file their final witness list on or before October 28, 2010.

The disclosure of witnesses shall include the full name of each witness, a short summary of anticipated testimony. If certain required information is not available, the disclosures shall so state.

Not later than October 28, 2010, the parties shall exchange copies of (or, when appropriate, make available for inspection) all exhibits to be offered and all schedules, summaries, diagrams and charts to be used at the hearing. Each proposed exhibit shall be pre-marked for identification and tabbed in 3-ring binders to the extent possible.

The parties shall attempt to agree upon and submit a jointly prepared consolidated and comprehensive set of joint exhibits.

The parties stipulation of uncontested facts, if any, shall be brought to the hearing.

Exhibit 2

The hearing has been set for November 10 and 11, 2010, pursuant to the enclosed Notice of Hearing.

<u>Please note: The Association does not require hard copies of submissions or exhibits for our file.</u>

This case will be administered by facilitating the exchange of appropriate written documents through the AAA. Please submit all correspondence to the undersigned for transmittal to the arbitrator, copying the other party.

All deadlines shown herein will be strictly enforced. After such deadline, the parties may not file such motions except with the permission of the arbitrator, good cause having been shown.

This order shall continue in effect unless and until amended by subsequent order of the arbitrator.

You may also share and manage correspondence through AAA's WebFile. The Case Manager will determine who should receive viewing privileges and grant access accordingly.

If you have any questions, please do not hesitate to call.

Sincerely,

*Diane Ratcliff*

Diane Ratcliff
Case Manager
800 804 9792
RatcliffD@adr.org

*Supervisor Information: Lesley Barton, 972 702 8222, BartonL@adr.org*

DR
Encl.

cc:   Karen Pena  **VIA E-MAIL ONLY**
      Lynne M. Gomez, Esq.  **VIA E-MAIL ONLY**

FROM WAOBIKEZE LAW FIRM, P.C.  (WED)SEP 29 2010 15:35/ST. 15:32/No. 6871078824 P 2



# WAOBIKEZE LAW FIRM, P.C.

Attorneys & Counselors at Law

September 29, 2010

*VIA FACSIMILE ONLY: 210-370-4119/972-490-9008*

VALERO RETAIL HOLDINGS, INC.
*Attn: Virgina Honeyman*
PO Box 696000
San Antonio, Texas 78269

AMERICAN ARBITRATION ASSOCIATION
*Attn: Diane Ratcliff*
13455 Noel Road, Suite 1750
Dallas, Texas 75240

   RE: AAA Case No 70 160 00113 10; In the matter of *Joshua Jumbo vs. Valero Retail Holdings, et al.*

Dear Ms. Honeyman/Ms. Ratcliff:

  As you may be aware, this law firm has been retained to represent JOSHUA JUMBO in the above referenced matter. All future correspondence shall be mailed to our office at 9950 Westpark Drive, Suite 424, Houston, Texas 77063-5271.

  We understand that a date has been set for said Arbitration and hereby request that you forward any/all information regarding said Arbitration to us at your earliest convenience.

Sincerely,

WAOBIKEZE LAW FIRM, P.C.

By: _____
  Ike N.A. Waobikeze, Esq.

INAW/ses

cc: File

---

Exhibit 3